4 So.3d 614 (2009)
E.A.R., a child, Petitioner,
v.
STATE of Florida, Respondent.
No. SC08-506.
Supreme Court of Florida.
January 30, 2009.
Rehearing Denied March 2, 2009.
*616 Carey Haughwout, Public Defender, and Elisabeth Porter, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, Celia Terenzio, Bureau Chief, and Melanie Dale Durber, Assistant Attorneys General, West Palm Beach, FL, for Respondent.
LEWIS, J.
The Fourth District Court of Appeal has certified conflict between its decision in E.A.R. v. State, 975 So.2d 610 (Fla. 4th DCA 2008), and the decision of the Second District Court of Appeal in M.S. v. State, 927 So.2d 1044 (Fla. 2d DCA 2006). See E.A.R., 975 So.2d at 613; see also A.T. v. State, 983 So.2d 679, 679 (Fla. 4th DCA 2008) (certifying conflict on the same issue), notice invoking discretionary review filed, No. SC08-1159 (Fla. June 12, 2008). We now exercise our discretionary jurisdiction to resolve this inter-district impasse. See art. V, § 3(b)(4), Fla. Const. The precise issue at the center of this conflict is whether chapter 985, Florida Statutes (2007),[1] requires juvenile courts to justify departures from the Department of Juvenile Justice's ("DJJ") recommended dispositions[2] by explaining a judge's "reasons" *617 for a departure in terms of the characteristics of the imposed restrictiveness level vis-à-vis the rehabilitative needs of the child (i.e., a utilitarian comparison between (1) the type of custodial confinement that the juvenile will experience, and (2) the most appropriate dispositional services for the child given his or her individual needs and treatment plan).[3]
At first blush, this issue may appear to be simple, somewhat esoteric, and purely procedural but is, in actuality, very practical and fundamental to the statutory role that a juvenile court must fulfill during a disposition hearing. See § 985.03(21), Fla. Stat. (2007). As we have previously observed, the Legislature created the juvenile justice system as a separate, distinct rehabilitative alternative to the more punitive, incapacitation-oriented criminal justice system. See V.K.E. v. State, 934 So.2d 1276, 1278 (Fla.2006); State v. J.M., 824 So.2d 105, 114 (Fla.2002); P.W.G. v. State, 702 So.2d 488, 490-91 (Fla.1997); In re C.J.W., 377 So.2d 22, 24 (Fla.1979); cf. N.C. v. Anderson, 882 So.2d 990, 994 (Fla. 2004) ("The State has `a parens patriae[4] interest in preserving and promoting the welfare of the child,' which makes a juvenile proceeding fundamentally different from an adult criminal trial." (citation omitted) (quoting Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982))). Thus, Florida's treatment of juvenile delinquency is largely sui generis. Here, we conclude that these distinctions are readily identifiable and inherent in the dispositional process, which has been comprehensively addressed by our Legislature under chapter 985.
For the reasons expressed in our analysis, we quash the decision of the Fourth District in E.A.R. v. State, 975 So.2d 610 (Fla. 4th DCA 2008), disapprove A.T. v. State, 983 So.2d 679 (Fla. 4th DCA 2008), and conclude that chapter 985  read in pari materia  compels the adoption of a version of the restrictiveness-level-needs-of-the-child standard articulated by the First, Second, and Fifth District Courts of Appeal. See, e.g., N.B. v. State, 911 So.2d 833, 835-36 (Fla. 1st DCA 2005); M.S. v. State, 927 So.2d 1044, 1046 (Fla. 2d DCA 2006); J.M. v. State, 939 So.2d 1138, 1139 (Fla. 5th DCA 2006). Our only modifications of the standard announced and applied by these courts stem directly from the statutory scheme, which, in addition to focusing upon rehabilitation, individualized treatment, and the juvenile court's exercise of appropriate discretion, explicitly *618 states that "with respect to juvenile justice and delinquency prevention," it is the intent of the Legislature to "protect the public from acts of delinquency," section 985.02(3), Florida Statutes (2007), and also provides that it is the duty of the juvenile court to provide "the most appropriate dispositional services [for the child] in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007) (emphasis supplied). As we explain below, these twin goals of the juvenile justice system (rehabilitation and protection of the public) are not necessarily irreconcilable but are, in fact, complementary[5] and, further, mandate the type of "reasons" that the juvenile court must provide to justify a departure disposition under section 985.433(7)(b), Florida Statutes (2007).

I. BACKGROUND
During fiscal year 2007-08, the circuit courts of this state committed 6,616 juveniles to residential treatment facilities. See Florida Department of Juvenile Justice, Five Year Juvenile Delinquency Trends and Conditions, http://www.djj. state.fl.us/Research/Trends.html (last accessed Jan. 27, 2009). Consequently, identifying the proper standard and elements by which juvenile courts may permissibly depart from the DJJ's recommended dispositions is enormously important to the futures of thousands of children per year (not to mention the future of Florida). The treatment programs and services available to committed juveniles vary between commitment facilities. Therefore, once the DJJ has identified the restrictiveness level  and thereby the commitment facilities  that are most appropriate in terms of the child's individual rehabilitative needs, treatment plan, and the goal of protecting the public, it would defeat the legislative scheme of chapter 985 to allow the juvenile court to depart from the DJJ's professional disposition recommendation for just any "reason" that may be present in the materials previously provided and already considered by the DJJ. Such a rule of law would thwart legislative intent, invite judicial capriciousness, and promote the inconsistent application and development of legal doctrine. Section 985.433(7)(b) does provide the juvenile court a measure of discretion to depart from the DJJ's recommended disposition when the DJJ has overlooked, failed to sufficiently consider, or misconstrued a significant characteristic of the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public; however, it does not grant the juvenile court a license to promote procedural arbitrariness whenever the court simply disagrees with the DJJ. Any other approach would further ignore the Legislature's command in the last clause of section 985.433(7)(b) to provide meaningful appellate review of such departure dispositions.

A. E.A.R.'s Juvenile Offenses
E.A.R., the juvenile offender involved in this case, is currently a seventeen-year-old held in State custody. He was somewhat younger at the time he committed the offenses that led to his eventual placement in a high-risk DJJ residential-commitment program. E.A.R. committed the first relevant offense, trespass to a structure (a second-degree misdemeanor if prosecuted *619 as an adult),[6] between October 7 and 12, 2005. At that time, he and another male juvenile entered the home of an individual who was vacationing abroad. Once inside, the boys damaged the interior and fixtures of the home and then fled. E.A.R. was fourteen at the time he committed this offense.
Later, on November 5, 2005, E.A.R. committed the second relevant offense, burglary of an unoccupied conveyance while unarmed (a third-degree felony if prosecuted as an adult).[7] He and a male accomplice attempted to break into a parked automobile. E.A.R. stood as a lookout while his accomplice unsuccessfully attempted to gain access to the interior of the automobile. The victim did not report any missing items or damage to the vehicle. E.A.R. was one day short of his fifteenth birthday when he committed this offense.
On August 15, 2006, E.A.R. pled guilty to these two offenses in exchange for withheld adjudication and juvenile probation. As part of this plea bargain, E.A.R. agreed to testify against his accomplice(s). On January 29, 2007, E.A.R.'s probation officer and an assistant state attorney filed an affidavit and petition for violation of probation alleging that E.A.R. failed to comply with the requirements of his probation by missing school, breaking curfew, disobeying his legal guardian, and changing his residence without his probation officer's permission.
Contemporaneously, during late January of 2007, E.A.R. stole his legal guardian's checkbook and ran away from home. On the afternoon of January 30, 2007, E.A.R. committed the third relevant offense, uttering a forged instrument (a third-degree felony if prosecuted as an adult),[8] by entering a check-cashing business and attempting to exchange one of the stolen checks for $400. E.A.R. was taken into custody and placed in secure detention[9] pending his adjudication[10] and disposition. On February 8, 2007, the State amended its *620 petition for violation of probation to include E.A.R.'s new law violation.

B. DJJ Intake, Assessment, and Recommended Disposition
Once E.A.R. was in custody, law-enforcement and DJJ personnel began the intake process, which involves
the initial acceptance and screening by the [DJJ] of a complaint or a law enforcement report or probable cause affidavit of delinquency ... to determine the recommendation to be taken in the best interests of the child, the family, and the community. The emphasis of intake is on diversion and the least restrictive available services.

§ 985.03(27), Fla. Stat. (2007) (emphasis supplied); see generally ch. 985, part III, Fla. Stat. (2007) (addressing juvenile custody and intake). The DJJ accomplishes intake screening within "a case management system," through which DJJ personnel
assess the child's needs and risks and... determine the most appropriate treatment plan and setting for the child's programmatic needs and risks. The intake process shall result in choosing the most appropriate services through a balancing of the interests and needs of the child with those of the family and the public. The juvenile probation officer shall be responsible for making informed decisions and recommendations to other agencies, the state attorney, and the courts so that the child and family may receive the least intrusive service alternative throughout the judicial process.

§ 985.14(2), Fla. Stat. (2007) (emphasis supplied). For E.A.R.  and all juvenile offenders in Florida who face a delinquency petition and the anticipated prospect of custodial commitment  intake is the beginning of the process that ultimately produces the DJJ's predisposition report ("PDR"), in which the DJJ issues a professional recommendation for an appropriate disposition to the relevant circuit court.[11] As section 985.14(3)(a), Florida Statutes (2007), states:
[Intake] shall begin with [1] the detention risk assessment instrument and decision,[[12]] [and] shall include [2] the intake preliminary screening and comprehensive assessment[[13]] for substance *621 abuse treatment services, mental health services, retardation services, literacy services, and other educational and treatment services as components, additional assessment of the child's treatment needs, and classification regarding the child's risks to the community.... The completed multidisciplinary assessment process shall result in [3] the predisposition report.

(Emphasis supplied.)
To reach this professional disposition recommendation, "[t]he intake process and case management system ... provide a comprehensive approach to assessing the child's needs, relative risks, and most appropriate handling, ... based on an individualized treatment plan." § 985.14(4), Fla. Stat. (2007) (emphasis supplied). The treatment plan should provide the "setting most appropriate to meet the child's programmatic needs and provide the minimum program security needed to ensure public safety." § 985.14(3)(c), Fla. Stat. (2007) (emphasis supplied); see also § 985.43(1)(a), Fla. Stat. (2007) (substantially similar). The DJJ must provide a comprehensive evaluation and PDR concerning "any child for whom a residential [i.e., custodial] commitment disposition is anticipated or recommended by an officer of the court or by the [DJJ]." § 985.185(1), Fla. Stat. (2007); see § 985.43(1)(a)-(b), Fla. Stat. (2007). The juvenile probation officer assigned to manage the child's case is responsible for coordinating the multidisciplinary assessment and producing the PDR. See § 985.145(1)(f), Fla. Stat. (2007).
Based on (1) E.A.R.'s current felony offense, (2) his prior offenses, (3) his previous failure to appear for a court hearing, (4) his habitual truancy, (5) his status as a runaway, (6) his purported involvement as a gang member or associate, and (7) his then-current use of marijuana and alcohol, a DJJ probation officer recommended that he face a judicial delinquency petition,[14] and corresponding adjudicatory hearing, rather than a nonjudicial resolution such as juvenile diversion or probation. The probation officer further recommended that E.A.R. remain in secure detention pending his adjudication and disposition. The State Attorney's Office supported these recommendations. The juvenile court entered a detention order on January 31, 2007, and a later detention-status order on February 9, 2007, approving the DJJ and State Attorney's recommendation that E.A.R. be held in secure detention pending disposition. Also on January 31, 2007, the State filed a two-count delinquency petition alleging that E.A.R. uttered a forged instrument (count I) and committed grand theft of goods in excess of $300 but less than $5,000 (count II).[15] On February 9, 2007, E.A.R. pled guilty to uttering a forged instrument, and the State nolle prosequied the grand-theft charge.
While in secure detention, the DJJ compiled E.A.R.'s comprehensive assessment and PDR. The comprehensive assessment and PDR revealed:
 E.A.R.'s birth mother placed him in a mental institution at age 3, and he has been in and out of the care of the Department of Children and Families ("DCF") ever since;
 At age 5, E.A.R. began a series of placements in foster homes. At age 7, his birth mother requested custody, and he lived with her and his stepfather for approximately one year. *622 E.A.R.'s stepfather was very violent and abusive during this time. E.A.R. was physically and sexually abused, and later returned to DCF custody;
 At age 13, E.A.R. went to reside with his biological father in Texas. His biological father introduced him to illegal drugs. E.A.R. was removed from his father's custody and sent back to DCF in Florida;
 E.A.R. ran away from foster care with a friend in December 2005;
 During September of 2006, an adult female benefactor became E.A.R.'s legal guardian after her minor daughter introduced her to E.A.R. and explained that he was homeless;
 E.A.R. admitted to a history of DJJ involvement;
 E.A.R. admitted to a history of truancy, running away, and violating curfew;
 E.A.R.'s guardian discovered drug paraphernalia in E.A.R.'s room;
 In the guardian's home, "[t]here [wa]s verbal intimidation, yelling, and heated arguments between family members";
 E.A.R.'s probation officer "reported [that his] longest period without `acting out' was 1 year, and he is a `good kid' but has developed a `living on the run mentality,' continuing to prefer to steal what he needs, and he will eventually `shut out' people [whom] he can trust";
 E.A.R. had previously threatened his guardian in a physical manner and demanded that she provide him with money;
 E.A.R. disclosed that he was a former gang associate or member;
 The guardian reported that E.A.R. was previously a member of "the Cripps"[16] gang in Broward County, and that this organization used E.A.R. to "sell and distribute drugs," but she believes that E.A.R. has cut his ties with this group;
 E.A.R. also self-identified as a founder and member of a "gang" or group called "Crazy White Boys" (CWB);
 E.A.R.'s MySpace.com webpage allegedly contained gang-related information, but neither the probation officer nor the guardian actually viewed the website first-hand;
 E.A.R.'s probation officer believes that E.A.R. is a gang member "because he is often in possession of a blue and white bandana";
 E.A.R. has worked at several fast-food restaurants, but has not held any position for a very long period of time;
 E.A.R. admitted to being a runaway, and to drinking beer and smoking marijuana since age 13;
 E.A.R. stated that he is addicted to cigarettes and nicotine;
 E.A.R. was psychologically evaluated on February 14, 2007, and exhibited symptoms consistent with depression;
 E.A.R. experiences chronic headaches, perhaps as the result of nicotine withdrawal. He was previously prescribed low dosages of Adderall,[17] Wellbutrin,[18] and Risperdal;[19]

*623  E.A.R. had been "somewhat compliant" during his juvenile probation, and he was courteous and cooperative during his interaction with law-enforcement and DJJ personnel;
 E.A.R. admitted to having physically fought with others;
 E.A.R. has not displayed empathy for his victims;
 E.A.R. has not been previously confined in a residential-commitment program;
 "There are reports/evidence of violent outbursts, displays of temper, and uncontrolled anger indicating potential for harm not included in [E.A.R.'s] criminal history."
The comprehensive assessment concluded by stating:
Available records, [E.A.R.'s] self-report, collateral information, and this objective assessment indicated [that he] presents ... a risk of danger to himself or others. [He] is also likely a risk for violence and aggression based upon empirical data.... Collateral information indicated [that] he ha[s] an extensive criminal history since 2003.... He is likely at risk for recidivism.... Given his extensive history of criminal acts and associated past intervention failures, his history of absconding, his high risk to [reoffend], and possible ineffective parental management, it is recommended that he be placed in a structured and well-supervised secure facility. Discharge planning should incorporate ongoing therapeutic services.
The assessment further recommended that E.A.R. receive mental-health and substance-abuse treatment during his residential commitment. The PDR stated that E.A.R.'s treatment should address his disruptive behaviors, such as attendance in an anti-theft course, education on appropriate coping skills, and instruction on how to avoid deviant behavior and peers. Consequently, the PDR specifically recommended a "moderate-risk residential commitment" pursuant to section 985.03(44)(c), Florida Statutes (2007), which states:
Programs or program models at this commitment level are residential but may allow youth to have supervised access to the community. Facilities are either environmentally secure, staff secure, or are hardware-secure with walls, fencing, or locking doors. Facilities shall provide 24-hour awake supervision, custody, care, and treatment of residents. Youth assessed and classified for placement in programs at this commitment level represent a moderate risk to public safety and require close supervision. The staff at a facility at this commitment level may seclude a child who is a physical threat to himself or herself or others. Mechanical restraint may also be used when necessary.

(Emphasis supplied.)

C. The Juvenile Court's Departure Disposition
On February 21, 2007, the juvenile court held a disposition hearing pursuant to part VII of chapter 985, Florida Statutes (2007), and Florida Rule of Juvenile Procedure 8.115. Again, disposition hearings provide the forum for the court to perform the legislatively required function of determining "the most appropriate dispositional services in the least restrictive available setting provided for under part VII" of chapter 985. § 985.03(21), Fla. Stat. (2007) (emphasis supplied). Once the juvenile court adjudicates a child delinquent, it considers the PDR, which
shall be the result of the multidisciplinary assessment ... and of the classification and placement process, and it shall indicate and report the child's priority *624 needs, recommendations as to a classification of risk for the child in the context of his or her program and supervision needs, and a plan for treatment that recommends the most appropriate placement setting to meet the child's needs with the minimum program security that reasonably ensures public safety.

§ 985.43(1)(a), Fla. Stat. (2007) (emphasis supplied); see also § 985.43(3), Fla. Stat. (2007). Thus, the DJJ and the juvenile court's required disposition responsibilities are in accord. They must work together to ensure that the child's disposition provides the "most appropriate" placement and dispositional services with the "least" or "minimum" restrictiveness level necessary to protect public safety. "The court shall consider the child's entire assessment and predisposition report and shall review the records of earlier judicial proceedings prior to making a final disposition of the case." § 985.43(2), Fla. Stat. (2007). Furthermore, "[t]he court may, by order, require additional evaluations and studies to be performed by the department; the county school system; or any social, psychological, or psychiatric agency of the state." Id. In addition to the PDR and comprehensive assessment, the juvenile court
may receive and consider any other relevant and material evidence, including other written or oral reports or statements, in its effort to determine the appropriate disposition to be made with regard to the child. The court may rely upon such evidence to the extent of its probative value, even though such evidence may not be technically competent in an adjudicatory hearing.
§ 985.433(3), Fla. Stat. (2007); see also Fla. R. Juv. P. 8.115(a). The juvenile court's first responsibility is to determine whether the child should be adjudicated and committed. See § 985.433(6), Fla. Stat. (2007). In making this decision, the court may consider a nonexhaustive list of factors contained in section 985.433(6)(a)(h). If the court determines that it should adjudicate the child and commit him or her to the custody of the DJJ, it is required to state this determination on the record or in writing. See § 985.433(7), Fla. Stat. (2007). "The determination shall include a specific finding of the reasons for the decision to adjudicate and to commit the child to the department, including any determination that the child was a member of a criminal street gang." Id. With regard to the restrictiveness level of any commitment to DJJ custody:
The court shall commit the child to the department at the restrictiveness level identified or may order placement at a different restrictiveness level. The court shall state for the record the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the department. Any party may appeal the court's findings resulting in a modified level of restrictiveness under this paragraph.
§ 985.433(7)(b), Fla. Stat. (2007) (emphasis supplied).
In this case, E.A.R. requested the imposition of juvenile probation and placement at the Palm Beach Marine Institute, while the State requested commitment to a moderate- or high-risk DJJ residential facility followed by post-commitment juvenile probation. As part of the disposition process, the juvenile court reviewed the DJJ's professional comprehensive assessment and PDR  which recommended a "moderate-risk residential commitment"  and also considered live testimony from E.A.R., his legal guardian, and his probation officer. The guardian testified:

*625  E.A.R. did not steal a single check but, rather, took several;
 The guardian was concerned that if E.A.R. was not committed to a residential program, he would run away from home or foster care;
 The guardian's relationship with her daughter has improved since E.A.R. was taken into custody, as have her daughter's grades;[20]
 The guardian no longer trusts E.A.R., so she is not currently willing to take him back into her home;
 "Crazy White Boys" was not a gang, but a group of boys who like the same rap artist.
The probation officer testified:
 E.A.R. is "truly a flight risk";
 It was speculative whether E.A.R. was a member of "the Cripps" gang and whether he formed  pursuant to the legal definition provided in section 874.03, Florida Statutes (2007)  a criminal street gang named "Crazy White Boys" or CWB, but then reversed course and claimed that "no, no, no ... [t]hat has been stated ... in conversations with him";
E.A.R. testified:
I just wanted to state about the affiliation with gangs, that when I was on the run, yes, I was hanging around the wrong people, who were affiliated with that. I have, since then, put myself aside from those kinds of people and just tried to focus on myself. When I'm out there, ... I'm not affiliated with them; I do not convers[e] with them;... it's not a way of life that I chose to take.
During the disposition hearing, the juvenile court conferred with the probation officer and determined that a secure moderate-risk facility was immediately available to house E.A.R. and address his treatment needs. Nevertheless, at the conclusion of the hearing, the court adjudicated E.A.R. delinquent, recounted only information contained in the comprehensive assessment and PDR (information which the DJJ had also considered), and then departed from the recommended moderate-risk residential commitment and, instead, committed E.A.R. to a high-risk residential program pursuant to section 985.03(44)(d), Florida Statutes (2007), which states:
Programs or program models at this commitment level are residential and do not allow youth to have access to the community, except that temporary release providing community access for up to 72 continuous hours may be approved by a court for a youth who has made successful progress in his or her program in order for the youth to attend a family emergency or, during the final 60 days of his or her placement, to visit his or her home, enroll in school or a vocational program, complete a job interview, or participate in a community service project. High-risk residential facilities are hardware-secure with perimeter fencing and locking doors. Facilities shall provide 24-hour awake supervision, custody, care, and treatment of residents. Youth assessed and classified for this level of placement require close supervision in a structured residential setting. Placement in programs at this level is prompted by a concern for public safety that outweighs placement in programs at lower commitment levels. The staff at a facility at this commitment level may seclude a *626 child who is a physical threat to himself or herself or others. Mechanical restraint may also be used when necessary. The facility may provide for single cell occupancy.

(Emphasis supplied.) Thus, at a minimum, moderate-risk commitment programs differ from high-risk commitment programs by allowing the juvenile offender "supervised access to the community." Further, moderate-risk facilities may be "environmentally secure, staff secure, or... hardware-secure," whereas high-risk facilities are "hardware-secure." A child committed to a high-risk facility must also pose a demonstrably greater risk to the community than one placed in a moderate-risk facility. Finally, in contrast to high-risk facilities, moderate-risk facilities do not allow for "single cell occupancy." Importantly, in addition to these differences, which are apparent from reading section 985.03(44), the anticipated "lengths of stay,"[21] treatment approaches, and available services vary between DJJ facilities. See Fla. Admin. Code 63E-7.009, 63E-7.016(3)(a)-(c); Florida Department of Juvenile Justice, Residential Facilities, http://www.djj.state.fl.us/Residential/ Facilities/index.html (last accessed Jan. 27, 2009); Florida Bar, Florida Juvenile Law and Practice § 8.13 (10th ed.2007). Therefore, a departure disposition may very well affect the length of commitment along with type and extent of rehabilitative treatment and services available to the juvenile. A departure disposition thus represents far more than a simple incremental increase in the restrictiveness level of the juvenile's commitment; rather, it may substantially alter the rehabilitative management of the child.
In support of its departure disposition, the juvenile court here provided the following on-the-record reasons:
Unfortunately [first], [E.A.R.] has become ungovernable; secondly, he is truly a flight risk; third, gang affiliation; [fourth,] danger to ... the public and society. Page 6 of the P.D.R. talks about his violent outbursts, his potential for harming others, uncontrolled anger. And there's more than support that he is a danger ... to the public. [Fifth,] [h]e's also a substance abuser, starting at the age of thirteen. [Sixth,] I'm going to accept the statements of the probation officer, her review of the Child and looking at what he wrote on his computer and things of that nature. There is gang affiliation here. And for all of those reasons, the Court's going to place him in a Level 8 [high-risk] program.
Defense counsel objected on the record and later filed a written objection to the juvenile court's departure disposition. Given these facts, which were included within the DJJ's comprehensive assessment and PDR, the juvenile court did not explain or even attempt to discuss why a high-risk commitment  as opposed to a moderate-risk commitment (which the DJJ recommended in its professional capacity)  provided "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007) (emphasis supplied).
Through oral and written objections, defense counsel contended that (1) an upward departure was unwarranted because the juvenile court's reasons were not supported *627 by a preponderance of the evidence, and (2) the court should have measured the restrictiveness level of the commitment program against the rehabilitative needs of E.A.R. to justify the imposition of a high-risk commitment. At a later hearing, held on February 28, 2007, defense counsel asserted that CWB is not a criminal street gang under section 874.03, Florida Statutes (2007), and that the juvenile court had considered bare allegations, rather than evidence, that E.A.R. was a current gang member, which is insufficient to support a departure disposition. Further, defense counsel contended that there was insufficient evidence that E.A.R. was a flight risk or a danger to the community. In response, the State contended that under section 985.433(7)(b), and associated case law, the juvenile court was free to consider the PDR, comprehensive assessment, and relevant evidence and testimony to reach a different conclusion than the DJJ with regard to the appropriate commitment restrictiveness level. In addition, the State claimed that sufficient evidence supported each of the reasons the juvenile court provided in support of its departure disposition. At the conclusion of the hearing, the court upheld its prior imposition of a high-risk residential commitment followed by post-commitment probation. E.A.R. timely filed a notice of appeal.

D. The Fourth District's Opinion and Certification of Conflict
On appeal, the Fourth District Court of Appeal framed the issue as:
[W]hether section 985.433(7)(b), Florida Statutes (2007), requires a trial court to specifically identify the "characteristics of the restrictiveness level imposed vis-à-vis the needs of the juvenile," when the trial court sentences a juvenile to a different restrictiveness level than that recommended by the [DJJ].
E.A.R. v. State, 975 So.2d 610, 610-11 (Fla. 4th DCA 2008) (footnote omitted). The district court held that section 985.433(7)(b), and its predecessor (section 985.23(3)(c), Florida Statutes (2005)), do not expressly impose such a requirement, and further stated that this requirement had developed from a dissent in J.L.O. v. State, 721 So.2d 440 (Fla. 5th DCA 1998), where it was observed that a juvenile court's departure reasons "must have reference to the characteristics of the restrictiveness level vis-à-vis the needs of the child." J.L.O., 721 So.2d at 443 (Griffin, C.J., dissenting) (citing § 985.03(45), Fla. Stat. (1997)); see E.A.R., 975 So.2d at 611. According to the Fourth District, later cases, such as J.M. v. State, 939 So.2d 1138, 1139 (Fla. 5th DCA 2006), and R.T. v. State, 946 So.2d 112, 113 (Fla. 1st DCA 2007), transformed this observation into an affirmative requirement that juvenile courts "must reference the characteristics of the restrictiveness level vis-à-vis the needs of the child." E.A.R., 975 So.2d at 611-12. "In this way, a general concept of relatedness evolved into a judge's obligation to articulate the precise connection between a sentence and the child's needs." Id. at 612. The Fourth District affirmed the juvenile court's departure decision[22] *628 and, as mentioned above, certified conflict with M.S. v. State, 927 So.2d 1044 (Fla. 2d DCA 2006), where the Second District held that a juvenile court "must `reference the characteristics of the restrictiveness level vis-à-vis the needs of the child'"[23] to justify a departure disposition. See E.A.R., 975 So.2d at 613.

II. ANALYSIS

A. Introduction and Applicable Rules of Statutory Construction
This case involves the interpretation of chapter 985, Florida Statutes (2007), within the context of a juvenile court's decision to depart from the DJJ's recommended disposition of a juvenile offender. Part VII of this chapter (sections 985.43-985.494) addresses the disposition process. However, chapter 985 also contains a comprehensive and extensive array of provisions that address legislative intent,[24] statutory definitions,[25] and the respective duties of the DJJ and the circuit court from juvenile intake through disposition.[26] Therefore, a disposition hearing is actually the culmination of a more extensive process, which the Legislature constructed to provide adjudicated juvenile offenders "the most appropriate dispositional services in the least restrictive available setting" while also protecting the public from further acts of delinquency. § 985.03(21), Fla. Stat. (2007); see also § 985.01-.02, Fla. Stat. (2007).
Conversely, in the decision below, the Fourth District focused exclusively upon one statutory provision, section 985.433(7)(b), Florida Statutes (2007), without addressing any related provisions that further reveal the Legislature's intent and address the broader standards that should control juvenile dispositions. See E.A.R., *629 975 So.2d at 610-11. This approach was contrary to well-established rules of statutory construction.
We review questions involving statutory interpretation de novo. See, e.g., Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC, 986 So.2d 1260, 1264 (Fla.2008). The intent of the Legislature is the polestar of statutory construction. See, e.g., Borden v. East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006). To discern this intent, the Court looks "primarily" to the plain text of the relevant statute, and when the text is unambiguous, our inquiry is at an end. Id. However,
if a part of a statute appears to have a clear meaning if considered alone but when given that meaning is inconsistent with other parts of the same statute or others in pari materia, the Court will examine the entire act and those in pari materia in order to ascertain the overall legislative intent.
ContractPoint, 986 So.2d at 1265-66 (brackets omitted) (quoting Fla. State Racing Comm'n v. McLaughlin, 102 So.2d 574, 575-76 (Fla.1958)). "The doctrine of in pari materia is a principle of statutory construction that requires that statutes relating to the same subject or object be construed together to harmonize the statutes and to give effect to the Legislature's intent." Fla. Dep't of State v. Martin, 916 So.2d 763, 768 (Fla.2005). As part of this inquiry, we must address the legislation "as a whole, including the evil to be corrected, the language, title, and history of its enactment, and the state of law already in existence." Bautista v. State, 863 So.2d 1180, 1185 (Fla.2003) (quoting State v. Anderson, 764 So.2d 848, 849 (Fla. 3d DCA 2000)). Here, the Florida Legislature has provided a comprehensive statutory scheme, and we attempt to follow the requirements that it has set forth.

B. Relevant Background Concerning the Development of Florida's Contemporary Juvenile Justice System
The majority of the relevant legislation was originally enacted as part of the Juvenile Justice Act of 1990 and is remedial in nature: "It is the intent of the Legislature that this chapter be liberally interpreted and construed in conformity with its declared purposes." Ch. 90-208, § 1, at 1087, Laws of Fla. (emphasis supplied); § 39.001(4), Fla. Stat. (Supp.1990) (emphasis supplied); § 985.01(2), Fla. Stat. (2007) (emphasis supplied). Courts should not interpret remedial statutes strictly or narrowly to thwart the intent of the Legislature. See, e.g., BellSouth Telecommunications, Inc. v. Meeks, 863 So.2d 287, 290 (Fla.2003). We must first address and describe the legislative development that eventually produced chapter 985. We must then determine if this comprehensive legislative development supports a version of the restrictiveness-level-needs-of-the-child standard adopted by the First, Second, and Fifth District Courts of Appeal. See, e.g., N.B. v. State, 911 So.2d 833, 835-36 (Fla. 1st DCA 2005); M.S. v. State, 927 So.2d 1044, 1046 (Fla. 2d DCA 2006); J.M. v. State, 939 So.2d 1138, 1139 (Fla. 5th DCA 2006).
During the 1970s and 1980s, our juvenile justice system was in shambles and under siege with legal actions filed by juveniles and their representatives in state and federal court that sought to improve the conditions in Florida's former system of "state training schools." Florida Juvenile Law and Practice, supra, § 1.14. To combat these poor conditions, the State entered into a consent decree in one federal action and, thereby, agreed to reduce the juvenile population in the training schools and to establish "a system of programs and services to meet the individual needs of juvenile offenders, including a *630 continuum of care, a multidisciplinary assessment process, and a classification system based on risk factors." Id.; see also Fla. H.R. Comm. on Children & Youth, HB 3681 (1990) Staff Analysis 3 (final May 16, 1990) (on file with Fla. State Archives, series 19, carton 2353), at 4 ["HB 3681 Final Staff Analysis"] ("[The Act] integrates the requirements of the [federal] Consent Decree by requiring a multidisciplinary assessment, risk classification, and placement process. The process begins with the risk assessment instrument (RAI) at detention, includes the preliminary screening and comprehensive assessment..., and results in the predisposition report (PDR). This report will recommend the child's priority needs, classification as it relates to risk to the community, and an appropriate treatment plan and placement.").
The 1990 Act was consistent with the goal of "develop[ing] a community-oriented juvenile justice system which treats juveniles in the least restrictive manner while ensuring the safety of the community." HB 3681 Final Staff Analysis at 10 (emphasis supplied). In relevant part, the title of the session law states:
[r]evis[ed], reorganize[ed], and combin[ed] chapters 39 and 959, F.S.; amend[ed] s. 39.001, F.S.; provid[ed] purpose; amend[ed] s. 39.002, F.S.; provid[ed] legislative purpose for the juvenile justice system; amend[ed] s. 39.01, F.S.; revising definitions ...; provid[ed] for medical, psychiatric, psychological, substance abuse, and educational examination and treatment; provid[ed] for intake and case management procedures and criteria, including a case management system and multidisciplinary assessment and classification and placement procedures ...; authorize[ed] departure from department-recommended restrictiveness levels based upon preponderance of the evidence ... [[27]]; provid[ed] powers of disposition....
Ch. 90-208, title, at 1083, Laws of Fla. The 1990 Act revised section 39.01(21), Florida Statutes, the precursor to section 985.03(21), Florida Statutes (2007), to state:
"Disposition hearing" means a hearing in which the court determines the most appropriate dispositional services in the least restrictive available setting provided for under s. 39.052(3) 39.09(3), in delinquency cases....
Ch. 90-208, § 3, at 1090-91, Laws of Fla.;[28]see also § 39.01(21), Fla. Stat. (Supp.1990); § 985.03(21), Fla. Stat. (2007). In turn, the Act created section 39.052(3)(e)1.-3., Florida Statutes, which read:
1. If the court determines that the child should be adjudicated as having committed a delinquent act and that he should be committed to the department, such determination shall be in writing or on the record of the hearing. The determination shall include a specific finding of the reasons for the decision to adjudicate and to commit the child to the department.
2. If the court determines that commitment to the department is appropriate, the intake counselor or case manager *631 shall recommend to the court the most appropriate placement and treatment plan, specifically identifying the restrictiveness level most appropriate for the child.

3. The court shall commit the child to the department at the restrictiveness level identified or may order placement at a different restrictiveness level. The court shall state in writing reasons which establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the department. Any party may appeal the court's findings resulting in a modified level of restrictiveness pursuant to this subparagraph.
Ch. 90-208, § 5, at 1129, Laws of Fla. (emphasis supplied); § 39.052(3)(e)1.-3., Fla. Stat. (Supp.1990) (emphasis supplied). Section 985.433(7)(a)-(b), Florida Statutes (2007), which governs disposition hearings in delinquency cases, contains very similar language but does not require that the juvenile court state its departure reasons in writing; instead, these reasons must simply be presented on the record. Relatedly, the 1990 Act created section 39.01(61), Florida Statutes, which defined "restrictiveness level" as:
[T]he identification of broad custody categories for committed children, including nonresidential, residential, and secure residential. Specific placement in restrictiveness levels within these categories depends on the risk and needs of the individual child. Restrictiveness levels must be established by the department by rule, provided however that there shall be no more than 8 levels.
Ch. 90-208, § 3, at 1094, Laws of Fla. (emphasis supplied); § 39.01(61), Fla. Stat. (Supp.1990) (emphasis supplied). Section 985.03(44)(a)-(e), Florida Statutes (2007), contains a more detailed definition of "restrictiveness level," which separately delineates each level, from low-risk residential to maximum-risk residential, based on the risks and needs of the youths that should be committed at the specified level. Finally, the 1990 Act provided the following legislative intent, which continues today under section 985.01(1)(e)1., Florida Statutes (2007):

To assure that the adjudication and disposition of a child alleged or found to have committed a violation of Florida law be exercised with appropriate discretion in keeping with the seriousness of the offense and the need for treatment services and that all findings made under this chapter be based upon facts presented at a hearing that meets the constitutional standards of fundamental fairness and due process.

Ch. 90-208, § 1, at 1087, Laws of Fla. (emphasis supplied) (strike-through text omitted); § 39.001(2)(f), Fla. Stat. (Supp. 1990) (emphasis supplied).

C. Section 985.433(7)(b), Florida Statutes (2007), Must Be Interpreted in Light of the Juvenile Court's Overarching Duty to Ensure that the Child Receive the "Most Appropriate Dispositional Services in the Least Restrictive Available Setting"
The enactment of these provisions, which continue to exist with minor modification and reorganization under the 2007 Florida Statutes, demonstrates that the Legislature clearly intended for the DJJ[29] and the juvenile courts to work in *632 concert to provide juvenile offenders with dispositions that adequately and individually address their particular needs and risk levels. Therefore, the statutory mandate that the court provide "reasons" justifying its decision to disregard and depart from the DJJ's recommended disposition must be interpreted in light of the juvenile court's overarching duty to determine "the most appropriate dispositional services in the least restrictive available setting" and the requirement that the juvenile court exercise "appropriate discretion" when doing so. §§ 39.001(2)(f), 39.01(21), Fla. Stat. (Supp.1990) (emphasis supplied); §§ 985.01(1)(e)1., 985.03(21), Fla. Stat. (2007) (emphasis supplied). These are the specific decisions that a juvenile court is required to make during a disposition hearing. The definitions provided in section 39.01, Florida Statutes (Supp.1990), and section 985.03, Florida Statutes (2007), do not define the "reasons" that the juvenile court must provide when departing from a DJJ-recommended disposition. However, when a term is not otherwise defined within a statutory scheme, "[i]t is appropriate to refer to dictionary definitions when construing" its meaning. Barco v. Sch. Bd. of Pinellas County, 975 So.2d 1116, 1122 (Fla.2008); see also Arnold, Matheny & Eagan, P.A. v. First Am. Holdings, Inc., 982 So.2d 628, 633 (Fla. 2008) (when a term is not otherwise defined in a statute, it must be given its "plain and ordinary meaning," which courts may discern through reference to dictionary definitions). The Oxford English Dictionary provides the following germane definitions for "reason":
1.a. A statement of some fact (real or alleged) employed as an argument to justify or condemn some act, prove or disprove some assertion, idea, or belief.
....
5.a. A fact or circumstance forming, or alleged as forming, a ground or motive leading, or sufficient to lead, a person to adopt or reject some course of action or procedure, belief, etc.
....
9. Rationale, fundamental principle, basis.
13 The Oxford English Dictionary 288 (2d ed.1989). Similarly, Merriam Webster's Collegiate Dictionary provides the following applicable definitions for "reason":
1a: a statement offered in explanation or justification .... b: a rational ground or motive .... c: a sufficient ground of explanation or of logical defense; esp.: something (as a principle or law) that supports a conclusion or explains a fact.... d: the thing that makes some fact intelligible....
Merriam Webster's Collegiate Dictionary 974 (10th ed.1996). Based on section 39.052(3)(e)3., Florida Statutes (Supp. 1990), and section 985.433(7)(b), Florida Statutes (2007), we know that the court's departure "reasons" may not be alleged, but rather must be real and supported by "a preponderance of the evidence." Moreover, based upon the applicable statutes, we know that any "explanation," "justification," "motive," or "reason" that the juvenile court employs to support its departure disposition, must emerge from  and further  its ultimate responsibility and obligation to exercise "appropriate discretion" in providing the juvenile offender with "the most appropriate dispositional services in the least restrictive available setting." §§ 39.001(2)(f), 39.01(21), Fla. Stat. (Supp.1990) (emphasis supplied); §§ 985.01(1)(e)1., 985.03(21), Fla. Stat. (2007) (emphasis supplied).
Consequently, within this statutory framework, the only "rational" or "logical" *633 means whereby the juvenile court may provide "reasons" that "explain," "support," and "justify" why one restrictiveness level is more appropriate than another is for the court to:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels (which are currently statutorily codified in section 985.03(44)(a)-(e), Florida Statutes (2007)) including (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential "lengths of stay" associated with each level, and the divergent treatment programs and services available to the juvenile at these levels (the DJJ possesses the expertise to provide this information); and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile  in the least restrictive setting  and maintaining the ability of the State to protect the public from further acts of delinquency.
Simply listing "reasons" that are totally unconnected to this analysis does not explain why one restrictiveness level is better suited for providing the juvenile offender with "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007) (emphasis supplied); see also §§ 985.03(44)(a)-(e), 985.433(7)(a)-(b) Fla. Stat. (2007). The failure to connect departure "reasons" to the juvenile court's ultimate statutory duty during a disposition hearing (i.e., determining the most appropriate dispositional services available for the child in the least restrictive available setting consistent with public safety while paying due regard to the child's rehabilitative needs and treatment plan) completely undermines the Legislature's carefully crafted statutory scheme. As indicated in section 985.433(7)(b), these "reasons" must "establish[[30]] by a preponderance of the evidence why the court is disregarding[[31]] the assessment of the child and the restrictiveness level recommended by the [DJJ]." (Emphasis supplied.) Accordingly, simply regurgitating factors or information provided by, and contained within, the DJJ's comprehensive assessment and PDR does not establish or provide the statutorily required "reasons" that explain why the court is "disregarding" these documents and the DJJ's corresponding disposition recommendation.[32] Such parroting of "reasons" merely communicates that the court concurs with the DJJ's assessment *634 and PDR but then, for some unexplained, unarticulated "reason," has imposed a judicially recrafted disposition. We conclude that simply parroting is insufficient to justify departure and that, instead, the juvenile court's stated "reasons," must provide a legally sufficient foundation for "disregarding" the DJJ's professional assessment and PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public. In large part, this is why the juvenile court is permitted to consider live testimony and other evidentiary items not included within the DJJ's comprehensive assessment and PDR. See §§ 985.43(2), 985.433(3), Fla. Stat. (2007); Fla. R. Juv. P. 8.115(a).
When read in pari materia, this construction follows ineluctably from the statutory scheme. Any other interpretation would fail to harmonize the various provisions of the Act or chapter and would improperly discount the Legislature's stated intent that (1) the adjudication and disposition process "be exercised with appropriate discretion in keeping with the seriousness of the offense and the [child's] need for treatment services" and (2) that the "chapter be liberally interpreted and construed in conformity with its declared purposes." §§ 39.001(2)(f), (4), Fla. Stat. (Supp.1990) (emphasis supplied); §§ 985.01(1)(e)1., (2), Fla. Stat. (2007) (emphasis supplied). The Florida Legislature did not enact a comprehensive statutory scheme and create a conscientious agency with recognized professional expertise to simply have the scheme and this expertise disregarded at the whim of the judicial branch without a thoughtful, substantive explanation.
Subsequent to the enactment of these provisions in 1990, there have been many statutory additions, rephrasings, and at least two major reorganizations. See generally Florida Juvenile Law and Practice, supra, §§ 1.14-1.17. For example, in 1997, the Legislature removed all delinquency provisions from chapter 39 and placed them in the newly created chapter 985 because, according to the DJJ, the then-current organization of chapter 39 was illogical and produced confusion and inconsistency in application. See HB 1369 Staff Analysis at 4. Then, in 2006, the Legislature reorganized chapter 985 by reordering and renumbering its provisions in conformity with the sequence of a delinquency case. See generally ch. 2006-120, Laws of Fla. Throughout this process, the intent of the Legislature has generally remained consistent, although protection of the public has assumed greater importance. See generally §§ 985.01-.02, Fla. Stat. (2007). Furthermore, the provisions concerning (1) the juvenile court's paramount duty and primary requirement during a disposition *635 hearing  i.e., to determine "the most appropriate dispositional services in the least restrictive available setting provided for under part VII" of chapter 985  [33] and (2) the ability of the juvenile court to depart from the DJJ's recommended sentence by stating "for the record the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the" DJJ[34] have been renumbered and undergone minor revisions, but have remained fundamentally the same.
In sum, when departing from the DJJ's professionally recommended disposition, the Act or chapter  read as a whole  not only requires that the juvenile court state its departure "reasons" on the record, and that the reasons be supported by a preponderance of the evidence, but also requires that the proffered reasons address and explain why departure is necessary to provide the juvenile offender with "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007); see also §§ 985.01-.02, 985.03(44)(a)-(e), 985.433(7)(a)-(b), Fla. Stat. (2007). Our analysis provides a statutorily based standard for determining whether the juvenile court has supplied legally sufficient "reasons" to explain and justify how its departure disposition provides the child with an appropriate disposition.

D. As Modified, the Restrictiveness-Level-Needs-of-the-Child Analysis is an Appropriate Standard Through Which to Measure the Juvenile Court's Fulfillment of its Dispositional Duty
Prior to the dissent in J.L.O. v. State, 721 So.2d 440, 442-43 (Fla. 5th DCA 1998), Florida appellate decisions had not provided a cohesive, statutorily based legal standard to determine whether a juvenile court's stated departure reasons were legally sufficient and whether the departure disposition was the product of appropriate discretion. Without such a standard, the appellate courts lacked a viable basis for meaningful review to determine whether and how a departure disposition provided a juvenile with "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007). However, the dissent in that case provided a nascent, viable standard that would eventually become the majority approach in this state:
Though the lower court has satisfied the statutory requirement of stating the reason for departing from the DJJ recommendation, common sense dictates that not just any reason will do. The reason must have reference to the characteristics of the restrictiveness level vis-à-vis the needs of the child. See § 985.03(45)(1997).
J.L.O., 721 So.2d at 443 (Griffin, C.J., dissenting) (some emphasis supplied) (citation omitted). It became recognized that simply stating any reason that may be factually supported in the DJJ's comprehensive assessment and PDR is insufficient, standing alone, to justify departure under the statutory scheme constructed by the Legislature. Rather, the stated departure reasons must have reference to how the characteristics of the restrictiveness level relate to, and further, the needs of the child, while providing adequate protection to the public, because that is the animating *636 purpose and requirement of the disposition hearing. To support this proposition, courts have relied, inter alia, on section 985.03(45), Florida Statutes (1997),[35] which separately delineated each level  from low-risk residential to maximum-risk residential  based on the needs and risks associated with the type of youth who should be committed at the specified level. See § 985.03(45)(a)-(e), Fla. Stat. (1997).
Through subsequent refinement, this standard evolved into the following legal framework for reviewing the sufficiency of a juvenile court's decision to depart from the DJJ's disposition recommendation:
A trial judge may not deviate from DJJ's recommendation at a juvenile delinquency disposition hearing simply because the judge disagrees with the recommendation. See K.M. v. State, 891 So.2d 619, 620 (Fla. 3d DCA 2005). In order to deviate, a trial court must identify adequate reasons, grounded in the evidence, for disregarding the recommendation. See A.C.N.[ v. State], 727 So.2d [368, 370 (Fla. 1st DCA 1999)]. A judge may reweigh the same factors [that] the [DJJ] considered and come to a different conclusion. But, when the court does so, the court "must set forth its reasons in the context of the needs of the child." E.S.B. v. State, 822 So.2d 579, 581 (Fla. 1st DCA 2002). The judge's findings "must have reference to the characteristics of the restrictiveness level vis-à-vis the needs of the child." Id. The judge must explain why the judge came to a different conclusion than the [DJJ], and explain why the new restrictiveness level is indicated.
N.B. v. State, 911 So.2d 833, 835-36 (Fla. 1st DCA 2005). The Second and Fifth Districts have also adopted this statutorily based approach. See, e.g., M.S. v. State, 927 So.2d 1044, 1046 (Fla. 2d DCA 2006); P.R. v. State, 782 So.2d 911, 913 (Fla. 5th DCA 2001). As we have explained, a complete reading of chapter 985's provisions supports a modified version of this standard.
For a period of time, even the Fourth District followed this standard and held that "the reasons set forth by the court for disregarding the recommendation level must reference the characteristics of the restrictiveness level vis-à-vis the needs of the child." See S.L.K. v. State, 776 So.2d 1062, 1064 (Fla. 4th DCA 2001) (citing A.C.N. v. State, 727 So.2d 368, 369 (Fla. 1st DCA 1999)). Nevertheless, that district eventually receded from this position based on a claim that its prior articulation of the rule was dicta. See K.S. v. State, 835 So.2d 350, 352 (Fla. 4th DCA 2003); see also E.A.R., 975 So.2d at 610-11; A.T., 983 So.2d at 679. Since that step back, the Fourth District has maintained that the text of section 985.433(7)(b), and its predecessors, does not require the juvenile court to "reference the characteristics of the restrictiveness level vis-à-vis the needs of the child." See, e.g., E.A.R., 975 So.2d at 611-13. However, based on our research, the Fourth District has not construed the provisions of chapter 985 in pari materia or analyzed any of the underlying legislative intent and historical development that led to the enactment of these provisions. The Fourth District also has not articulated an alternative, statutorily based substantive standard to separate sufficient from insufficient departure reasons, which would thereby fulfill the Legislature's stated intent that the appellate courts of this state provide meaningful review of departure dispositions. See § 985.433(7)(b), Fla. Stat. (2007). Instead, the Fourth District has (1) expressed tepid support for a vague "general concept of relatedness" and *637 (2) held that so long as the juvenile court's on-the-record departure reasons are supported by a preponderance of the evidence, the court has not abused its discretion in departing from the DJJ's recommended disposition. See, e.g., E.A.R., 975 So.2d at 611-13.
The Third District does not appear to have taken an explicit stance on this issue, but has issued a decision holding that a juvenile court's departure reasons were not supported by a preponderance of evidence where the court departed from the DJJ's recommended disposition of a moderate-risk commitment and, instead, imposed a high-risk commitment:
Although [the child] ran away from her foster home, she was not placed in a moderate-risk placement prior to the institution of the current proceedings and, therefore, never ran away from such placement. Thus, there is no evidence that a moderate-risk placement would be insufficient to keep [the child] under control.
... [S]ection 985.03(45)(c), provides "[p]lacement in programs at [the high-risk residential] level is prompted by a concern for public safety that outweighs placement in programs at lower commitment levels." It is clear that the statute is referring to juveniles who have committed offenses of violence towards others such that they pose a genuine threat to the physical safety to members of the public. Although [the child's] activities were illegal, they did not pose a threat of physical harm and thereby require that [the child] be placed in a facility where she would have no access to the community.
K.M. v. State, 891 So.2d 619, 620-21 (Fla. 3d DCA 2005) (citations omitted). Therefore, in K.M., the Third District partially analyzed the characteristics of the alternative restrictiveness levels, in light of the needs and risks of the child, to determine that the reasons supplied by the juvenile court (flight risk and threat to public safety) were not supported by a preponderance of the evidence. See id. Such an analysis reinforces the conclusion that the only rational or logical means to exercise "appropriate discretion" and provide "reasons" explaining why one restrictiveness level is more appropriate than another  with regard to providing "the most appropriate dispositional services in the least restrictive available setting"  is to clarify the characteristics of the opposing restrictiveness levels and then explain why  in light of those differing characteristics  one level is better suited to serving the rehabilitative needs of the child and protecting the public from further acts of delinquency.
Even when the juvenile court's departure reasons are stated on the record, and are supported by a preponderance of the evidence, they may nonetheless be insufficient to explain and justify how the court's departure decision provides "the most appropriate dispositional services [for the child] in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007). Tellingly, the Legislature has defined the various restrictiveness levels for the very purpose of promoting comparison and identifying the level that best suits the needs and risks of the child. See § 985.03(44)(a)-(e), Fla. Stat. (2007). The Fourth District's noncommittal approach does not provide a principled basis for separating permissible from impermissible departure reasons, fails to require a basis for meaningful appellate review, and, likewise, fails to further the Legislature's statutory objectives, which include the underlying requirements for a sound determination at a disposition hearing. See §§ 985.01-.02, 985.03(21), 985.433(7)(b), Fla. Stat. (2007). In contrast, as modified, *638 the restrictiveness-level-needs-of-the-child standard fulfills the intent of the Legislature and harmonizes the relevant provisions of chapter 985.
Therefore, based on a comprehensive reading of chapter 985, we reiterate and adopt the following modified analysis, quash the decision of the Fourth District in E.A.R. v. State, 975 So.2d 610 (Fla. 4th DCA 2008), and disapprove its decision in A.T. v. State, 983 So.2d 679 (Fla. 4th DCA 2008). The only rational or logical means through which the juvenile court may provide "reasons" that explain, support, and justify why one restrictiveness level is more appropriate than another  and thereby rationalize a departure disposition  is for the court to:
(1) Articulate an understanding of the respective characteristics of the opposing restrictiveness levels including (but not limited to) the type of child that each restrictiveness level is designed to serve, the potential "lengths of stay" associated with each level, and the divergent treatment programs and services available to the juvenile at these levels; and
(2) Then logically and persuasively explain why, in light of these differing characteristics, one level is better suited to serving both the rehabilitative needs of the juvenile  in the least restrictive setting  and maintaining the ability of the State to protect the public from further acts of delinquency.
Simply listing "reasons" that are totally unconnected to this analysis does not explain why one restrictiveness level is better suited for providing the juvenile offender "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat. (2007) (emphasis supplied); see also §§ 985.03(44)(a)-(e), 985.433(7)(a)-(b) Fla. Stat. (2007). The failure to connect departure "reasons" to the juvenile court's ultimate statutory duty during a disposition hearing completely undermines the Legislature's carefully crafted statutory scheme. These "reasons" must "establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the [DJJ]." § 985.433(7)(b), Fla. Stat. (2007) (emphasis supplied). Simply regurgitating information provided by, and contained within, the DJJ's comprehensive assessment and PDR does not establish acceptable statutory reasons as to why the court is "disregarding" these documents and the DJJ's recommended disposition. Rather, such parroting merely communicates that the court concurs with the DJJ's assessment and PDR but then, for some unexplained, unarticulated "reason," has imposed a judicially recrafted disposition. We conclude that simply parroting is insufficient to justify departure and that, instead, the juvenile court's stated "reasons," must provide a legally sufficient foundation for "disregarding" the DJJ's professional assessment and PDR by identifying significant information that the DJJ has overlooked, failed to sufficiently consider, or misconstrued with regard to the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public. These are suitable means of insuring fulfillment of the Legislature's comprehensive scheme and its stated intent that the juvenile courts of this state exercise appropriate discretion with the ultimate aim of providing the juvenile offender the most appropriate dispositional services in the least restrictive available setting.
Accordingly, read in pari materia, the Legislature's statutory scheme discloses the following substantive measure of compliance with section 985.433(7)(b): (1) whether the juvenile *639 court has employed the proper legal standard (as outlined above) in providing its on-the-record departure reasons; and, if so, (2) whether its stated reasons are supported by a preponderance of the competent, substantial evidence contained within the record. Cf., e.g., A.S. v. State, 934 So.2d 583, 584 (Fla. 1st DCA 2006) (expressing a competent, substantial evidence standard of review). Whether the circuit court has exercised "appropriate discretion"[36] in imposing a departure disposition is measured by this statutorily based imperative. This standard should not be applied mechanically or tautologically; instead, the appellate courts of this state should remain cognizant of the legislative intent that they provide meaningful review of juvenile departure dispositions. Cf. Kent v. United States, 383 U.S. 541, 561, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) ("Meaningful review requires that the reviewing court should review. It should not be remitted to assumptions."). There is no room for boilerplate formalism on either the trial or appellate levels.

III. CONCLUSION
For the reasons expressed in our analysis, we quash the decision of the Fourth District Court of Appeal in E.A.R. v. State, 975 So.2d 610 (Fla. 4th DCA 2008), and disapprove its decision in A.T. v. State, 983 So.2d 679 (Fla. 4th DCA 2008). We further approve the decision of the Second District in M.S. v. State, 927 So.2d 1044 (Fla. 2d DCA 2006), to the extent that it is consistent with our analysis and holding. Finally, we remand to the Fourth District for further proceedings consistent with this decision.
It is so ordered.
QUINCE, C.J., PARIENTE, J., and ANSTEAD, Senior Justice, concur. CANADY, J., dissents with an opinion, in which WELLS and POLSTON, JJ., concur.
CANADY, J., dissenting.
Because I conclude that the majority has adopted a standard of review with respect to dispositions in delinquency cases that is unwarranted by the governing statute, I dissent.
Section 985.433(7)(b), Florida Statutes, unequivocally grants trial courts the discretion to "order placement" of a delinquent child "at a different restrictiveness level" than the level recommended by the Department of Juvenile Justice (DJJ). The exercise of such discretion under section 985.433(7)(b) is subject only to the requirement that the trial court "state for the record the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the department."
The question presented by this case is what standard of review should be used in determining whether to affirm or reverse a trial court's decision to disregard the restrictiveness level recommended by the DJJ. Given the language of section 985.433(7)(b), the statutory context, and principles of sound judicial administration, I conclude that an abuse-of-discretion standard is the appropriate standard of review. See J.L.O. v. State, 721 So.2d 440, 442 (Fla. 5th DCA 1998) (employing abuse-of-discretion standard and recognizing that trial court "was in a better position than [appellate court] in determining the most appropriate placement"). Facts relied on by the trial court in articulating the reasons for its decision must, of course, be based on *640 competent, substantial evidence in the record before the trial court.
The Legislature has recognized that "[i]t is the policy of the State with respect to juvenile justice and delinquency prevention to first protect the public from acts of delinquency." § 985.02(3), Fla. Stat. (emphasis added). It is also unquestionable that Florida's juvenile justice system is designed to further rehabilitative goals. But these broad purposes of the juvenile justice system do not justify the majority's imposition of a standard of review that effectively divests trial courts of the discretion given to them by the Legislature pursuant to section 985.433(7)(b). It is not appropriate to use broad statutory purposes as a basis for overriding a specific choice that the Legislature has made.
The reality is that disposition decisions involve weighing a wide array of circumstances which are relevant to determining "the most appropriate dispositional services in the least restrictive available setting." § 985.03(21), Fla. Stat.; see also § 985.433(6) (setting forth criteria to be evaluated in predisposition reports). It is evident from the text of section 985.433(7)(b) that the Legislature has recognized that a large measure of discretion is appropriately afforded to juvenile court judges as they make disposition determinations. The trial court's exercise of that discretion should be overturned only if there is an abuse of discretion. See Banks v. State, 732 So.2d 1065, 1068 (Fla.1999) (stating that trial court's determination of whether guidelines departure sentence is "the best sentencing option for the defendant" is based on weighing of "the totality of circumstances in the case" and is "judgment call within the sound discretion of the court [which] will be sustained on review absent an abuse of discretion").
When the trial court decides not to adopt the DJJ's recommended disposition, the statute simply requires that the trial court articulate reasons for that decision. The Legislature could have established a disposition scheme under which it specified particular reasons that would justify a trial court's decision to disregard the restrictiveness level recommended by the DJJ. Alternatively, the Legislature could have required that the trial court recite its consideration of particular factors specified by the Legislature or could have imposed some other specific burden on trial courts wishing to disregard the DJJ's recommendation. The Legislature has done none of these things.
The absence of specific statutory restrictions with respect to disposition determinations points to the conclusion that the Legislature recognized that a juvenile court "must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience" in juvenile dispositions. Koon v. United States, 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (adopting abuse-of-discretion standard for review of guidelines departure sentences). Given the Legislature's decision not to impose specific restrictions on disposition determinations, we should recognize that deference is owed to the "judicial actor [who] is better positioned than another to decide the issue in question." Pierce v. Underwood, 487 U.S. 552, 560, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (quoting Miller v. Fenton, 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)). A deferential standard of review is appropriate because the circumstances bearing on a juvenile disposition "involve multifarious, fleeting, special, narrow facts that utterly resist generalization." Pierce, 487 U.S. at 561-62, 108 S.Ct. 2541 (quoting Maurice Rosenberg, Judicial Discretion of the Trial Court, Viewed from Above, 22 Syracuse L.Rev. 635 (1971)).
*641 The majority, however, has adopted a standard which effectively shifts discretion from the trial court  where the statutory scheme placed the discretion  to the appellate court. The majority's standard requires that the trial court "logically and persuasively" justify the restrictiveness level it has chosen. The appellate court will, of course, determine whether the justification offered by the trial court is sufficiently logical and persuasive. This can only mean that each disposition decision that diverges from the department's recommendation will be subject to de novo review. Rather than applying an abuse-of-discretion standard, under which the reasons given for a disposition would be held insufficient only if they were reasons on which no reasonable judge could rely, appellate courts will reweigh all of the relevant circumstances and make a de novo determination concerning the appropriateness of the disposition.
The majority's standard shifts authority from a judge who has had the opportunity to personally observe the juvenile and who is in the best position to evaluate all of the relevant factors to judges whose only basis for judgment is a cold record. This standard, which no doubt results from a well-intentioned desire to protect children from unduly harsh dispositions, unjustifiably truncates the authority of juvenile court judges. In adopting this standard, the majority not only has gone beyond what is warranted by the statute but also has departed from the sound principle that "the reviewing attitude that [an appellate court] takes toward a [trial] court decision should depend upon `the respective institutional advantages of trial and appellate courts, not upon what standard of review will more likely produce a particular substantive result.'" First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (quoting Salve Regina College v. Russell, 499 U.S. 225, 233, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991)).
In addition to these issues of legislative authority and the superior perspective of trial courts, there are additional practical problems that arise from the complex and exacting standard adopted by the majority. The standard is set forth in two parts. The first part of the standard requires that the trial court "[a]rticulate an understanding of the respective characteristics of the opposing restrictiveness levels." In doing so the trial court must address: (a) "the type of child that each restrictiveness level is designed to serve"; (b) "the potential `lengths of stay' associated with each level"; and (c) "the divergent treatment programs and services available to the juvenile at these levels." The second part of the standard adopted by the majority requires that the trial court "logically and persuasively explain why ... one level is better suited to serving both the rehabilitative needs of the juvenile  in the least restrictive setting  and maintaining the ability of the State to protect the public from further acts of delinquency." In providing this explanation, the trial court must identify significant information that "the DJJ has overlooked, failed to sufficiently consider, or misconstrued" with regard to "the child's programmatic, rehabilitative needs along with the risks that the unrehabilitated child poses to the public." Majority op. at 618.
An obvious practical problem arises from the requirement that the trial court explain why "one [restrictiveness] level is better suited to serving both the rehabilitative needs of the juvenile ... and maintaining the ability of the State to protect the public from further acts of delinquency." There may well be tension between the goal of serving the rehabilitative needs of the child and the goal of protecting the public. Contrary to the assumption embodied *642 in the majority's standard, there may not be "one level [that] is better suited to serving both" goals. A choice may have to be made to give one goal priority.
Another practical problem with the standard imposed by the majority arises from the level of detail contemplated in the required "[a]rticulat[ion]" by the trial court of its "understanding of the respective characteristics of the opposing restrictiveness levels." In addressing the multiple elements enumerated by the majority, trial courts may employ one of two general strategies. They may develop boilerplate language to be recited as appropriate. Or, they may conduct extensive fact-finding regarding the enumerated elements. This first strategy is unlikely to provide any significant improvement in the disposition process, and the second strategy would impose an onerous burden on the juvenile courts which likely would unduly delay the processing of juvenile cases.
The detailed, complex, and strict standard adopted by the majority might be justifiable as a matter of policy. But it is not within the province of this Court to make the policy determinations on which such a standard is based. That is the responsibility of the Legislature.
Although less far-reaching, the standard adopted by the Second District Court of Appeal in M.S. v. State, 927 So.2d 1044 (Fla. 2d DCA 2006), suffers from the same basic flaw that is present in the standard adopted by the majority of this Court: it lacks a proper basis in the statute enacted by the Legislature. By focusing the disposition decision on the "needs of the child," the standard utilized in M.S. departs from the statute. The standard both ignores the discretion afforded by the Legislature to juvenile court judges and gives short shrift to the primary policy goal of "protect[ing] the public from acts of delinquency." § 985.02(3), Fla. Stat.
Accordingly, I would approve the Fourth District's decision that is on review and disapprove M.S.
WELLS and POLSTON, JJ., concur.
NOTES
[1] The Fourth District relied upon the 2007 version of chapter 985. However, it appears that E.A.R. committed the applicable juvenile offense during January of 2007 and was adjudicated delinquent and committed to the custody of the Department of Juvenile Justice during February of 2007. In contrast, the Governor did not even approve the Legislature's 2007 statutory adoption act until April 13, 2007 (this act provided that the 2007 version of the Florida Statutes "shall take effect immediately upon [its later] publication"). Ch. 2007-7, § 1, at 269, Laws of Fla. Thus, it appears that the 2006 version of chapter 985 was in effect during the pertinent timeframe. However, we will continue to rely upon the 2007 version for the sake of continuity, as there are no relevant substantive differences between the 2006 and 2007 versions.
[2] From a conceptual standpoint, "disposition" is the phase of a juvenile delinquency proceeding that roughly corresponds to sentencing during a criminal proceeding. See § 985.03(21), Fla. Stat. (2007); Fla. R. Juv. P. 8.115. However, the purpose, aim, and procedure associated with a juvenile disposition differ from those associated with a criminal sentence. Compare, e.g., § 985.01(1)(c),(e)1., Fla. Stat. (2007) (stating that the legislative purpose underlying chapter 985 includes due consideration for "the specific rehabilitation needs of the child," and adjudication and disposition decisions that are "in keeping with the seriousness of the offense and the need for treatment services"), and § 985.03(21), Fla. Stat. (2007) (mandating that the role of the juvenile court during a disposition hearing is to determine "the most appropriate dispositional services [for the child] in the least restrictive available setting" (emphasis supplied)), with § 921.001(4)(a)2., Fla. Stat. (2007) ("The primary purpose of sentencing is to punish the offender." (emphasis supplied)).

Reliance on (1) adult criminal decisions  many of which do not involve Florida law  and (2) extra-jurisdictional precedent applying federal law in civil contexts is theoretically and substantively inapt in this statute-specific, state-law context. See Banks v. State, 732 So.2d 1065 (Fla. 1999) (addressing statute-specific adult departure sentence); Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (addressing federal, statute-specific adult departure sentences); First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (addressing review issues associated with federal arbitration cases); Salve Regina College v. Russell, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (addressing federal appellate review of district-court state-law determinations); Pierce v. Underwood, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (addressing issues related to the award of attorney's fees under the federal Equal Access to Justice Act, 28 U.S.C. § 2412(d)); Miller v. Fenton, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (addressing standard of review with regard to a state prisoner's federal habeas challenge to the voluntariness of his or her confession). As we have previously observed, "[q]uotations from cases, shorn of their factual context, are not much help in making a decision." State v. Kelly, 999 So.2d 1029, ___ (Fla. 2008) (quoting United States v. Galindo-Gallegos, 244 F.3d 728, 730 (9th Cir.2001)).
[3] We cannot agree with our esteemed dissenting colleagues that this case merely addresses "what standard of review should [apply]" under these circumstances. Dissenting op. at 639. Before review may occur, the substantive requirements of the relevant statutes must be established. Accordingly, this case primarily involves a dispositive determination of the substantive dictates of the Legislature's statutory scheme. Once we have determined what the statutory scheme requires, only then do we address the applicable standard of review.
[4] "Parens patriae" refers to "the [S]tate in its capacity as provider of protection to those unable to care for themselves." Black's Law Dictionary 1144 (8th ed.2004).
[5] Cf. J.I.S. v. State, 930 So.2d 587, 595 (Fla. 2006) ("Residential commitments serve protective purposes in two ways. First, residential commitments provide DJJ the opportunity to rehabilitate juvenile offenders so they are not dangerous to themselves or others. Second, residential commitments separate offenders from society during the process of rehabilitation.").
[6] See § 810.08(1), (2)(a), Fla. Stat. (2005).
[7] See § 810.02(1)(b), (4)(b), Fla. Stat. (2005).
[8] See § 831.02, Fla. Stat. (2006).
[9] Section 985.03(18)(a), Florida Statutes (2007), defines "secure detention" as: "temporary custody of the child while the child is under the physical restriction of a detention center or facility pending adjudication, disposition, or placement." See also Schall v. Martin, 467 U.S. 253, 274, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984).
[10] Delinquency "adjudication" represents the juvenile equivalent of the guilt phase of a criminal trial. See §§ 985.03(2), 985.35, Fla. Stat. (2007); Fla. R. Juv. P. 8.110. However, as mentioned above, the underlying aim or purpose of the juvenile justice system differs from the adult criminal justice system. Further, there is no right to a jury trial during a delinquency proceeding. See art. I, § 15(b), Fla. Const. ("When authorized by law, a child as therein defined may be charged with a violation of law as an act of delinquency instead of crime and tried without a jury...." (emphasis supplied)); Fla. R. Juv. P. 8.110(c); McKeiver v. Pennsylvania, 403 U.S. 528, 545-51, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (holding that there is no right to a jury trial in a delinquency proceeding under the Sixth and Fourteenth Amendments to the federal Constitution) (plurality opinion). However, juveniles enjoy many of the "basic constitutional protections enjoyed by adults accused of crimes." Martin, 467 U.S. at 263, 104 S.Ct. 2403; see also In re Gault, 387 U.S. 1, 31-57, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) (notice of charges, right to counsel, privilege against self-incrimination, right to confront and cross-examine witnesses); In re Winship, 397 U.S. 358, 359, 367-68, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (the State must establish the juvenile offender's guilt "beyond a reasonable doubt"); Breed v. Jones, 421 U.S. 519, 531-40, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975) (double-jeopardy principles apply during juvenile proceedings).
[11] Section 985.433(7)(a), Florida Statutes (2007), provides:

The juvenile probation officer shall recommend to the court the most appropriate placement and treatment plan, specifically identifying the restrictiveness level most appropriate for the child. ... The court shall consider the [DJJ's] recommendation in making its commitment decision.
(Emphasis supplied.) Based on this recommendation, the circuit court's duty is to determine "the most appropriate dispositional services in the least restrictive available setting provided for under part VII" of chapter 985. § 985.03(21), Fla. Stat. (2007) (emphasis supplied).
[12] See § 985.145(1)(d), Fla. Stat. (2007) ("The juvenile probation officer shall ensure that a risk assessment instrument establishing the child's eligibility for detention has been accurately completed and that the appropriate recommendation was made to the court.").
[13] See § 985.145(1)(f), Fla. Stat. (2007) ("The juvenile probation officer shall coordinate the multidisciplinary assessment when required, which includes the classification and placement process that determines the child's priority needs, risk classification, and treatment plan."); see also § 985.03(11), Fla. Stat. (2007) ("`Comprehensive assessment' or `assessment' means the gathering of information for the evaluation of a juvenile offender's ... physical, psychological, educational, vocational, and social condition and family environment as they relate to the child's need for rehabilitative and treatment services, including substance abuse treatment services, mental health services, developmental services, literacy services, medical services, family services, and other specialized services, as appropriate." (emphasis supplied)).
[14] A delinquency petition is the juvenile equivalent of a criminal information. See § 985.318, Fla. Stat. (2007); Fla. R. Juv. P. 8.030, 8.035.
[15] See § 812.014(1), (2)(c)1., Fla. Stat. (2006).
[16] There is no definitive evidence in the record that "the Cripps" is, or was alleged to be, related to the nationally recognized loose affiliation of criminal street gangs known as "Crips." Cf. Florida Department of Corrections, Los Angeles-based Gangs-Bloods and Crips, http://www.dc.state.fl.us/pub/gangs/la. html (last accessed Jan. 27, 2009) (describing the Crips, Bloods, People Nation, and Folk Nation criminal street gangs).
[17] A trade-name amphetamine.
[18] A trade-name antidepressant.
[19] A trade-name antipsychotic.
[20] Such external concerns, which have nothing to do with the needs, well-being, and risks of the juvenile offender, are improper considerations during a disposition hearing. See §§ 985.03(21), 985.433, Fla. Stat. (2007).
[21] Florida Administrative Code provision 63E-7.002(42) provides that "length of stay" "[r]efers to the length of time a youth resides in a residential commitment program or to the designed length of stay for a particular residential commitment program, reflecting the anticipated time it will take most youth placed in the program to successfully complete it."
[22] In affirming the juvenile court, the Fourth District clearly recognized that the evidence of gang membership "was flimsy," but held that "[e]ven without the finding of a gang affiliation, ... there was adequate evidence that appellant was ungovernable, a flight risk, and a danger to the public." E.A.R., 975 So.2d at 612-13 (emphasis supplied) (citing K.S. v. State, 835 So.2d 350, 351 (Fla. 4th DCA 2003); C.T. v. State, 819 So.2d 869 (Fla. 4th DCA 2002), review dismissed, 848 So.2d 305 (Fla.2003)).

Juvenile courts must be aware that: (1) a finding of criminal street gang membership "shall be given great weight," section 985.433(6)(a), Florida Statutes (2007) (emphasis supplied), in determining the most appropriate disposition for the juvenile (which means that, in the context of a juvenile departure disposition, an erroneous finding of membership in a criminal street gang will have a significant impact on a child's disposition and commitment); (2) the State must supply proper evidence demonstrating that any alleged "criminal street gang" fulfills the definition supplied in section 874.03(1), Florida Statutes (2007); (3) establishing the existence of such an "organization, association, or group" is the first step in proving membership in a criminal street gang (by definition, if the "organization, association, or group" is not a "criminal street gang," then an individual who is a member of that non-gang "organization, association, or group" is NOT, by reason of that membership, a member of a "criminal street gang"); (4) once the State has satisfactorily established the legal existence of a "criminal street gang," it must prove, through proper evidence, that the juvenile offender satisfied "two or more" of the criteria presented in section 847.03(2), Florida Statutes (2007) (emphasis supplied), "at the time" that he or she committed the underlying offense, section 985.433(6)(a), Florida Statutes (2007) (emphasis supplied); and (5) there is a meaningful statutory distinction between a "criminal street gang member" under section 847.03(2), Florida Statutes (2007), and a "criminal street gang associate" under section 874.03(4)(a), Florida Statutes (2007) (i.e., section 985.433(7), Florida Statutes (2007)  the statute addressing juvenile disposition hearings  simply does not address "criminal street gang associates"). See also, e.g., L.B. v. State, 965 So.2d 1214, 1216-17 (Fla. 1st DCA 2007); R.C. v. State, 948 So.2d 48, 49-51 (Fla. 1st DCA 2007); A.H. v. State, 724 So.2d 1268, 1269 (Fla. 1st DCA 1999); A.K. v. State, 724 So.2d 660, 660-61 (Fla. 2d DCA 1999); S.L. v. State, 708 So.2d 1006, 1007-08 (Fla. 2d DCA 1998).
[23] M.S., 927 So.2d at 1046 (quoting A.J.V. v. State, 842 So.2d 1027, 1029 (Fla. 2d DCA 2003)).
[24] §§ 985.01-.02, Fla. Stat. (2007).
[25] § 985.03(1)-(57), Fla. Stat. (2007).
[26] §§ 985.101-.16, Fla. Stat. (2007) (custody and intake); §§ 985.18-.195, Fla. Stat. (2007) (examinations and evaluations); §§ 985.24-.275, Fla. Stat. (2007) (detention); §§ 985.318-.35 (petition, arraignment, and adjudication); §§ 985.43-.494, Fla. Stat. (2007) (disposition and post-disposition).
[27] Unfortunately, in this case, the title provides very little insight regarding what may constitute a sufficient departure "reason" because it merely reiterates the preponderance-of-the-evidence standard present in section 39.052(3)(e)3., Florida Statutes (Supp.1990), and section 985.433(7)(b), Florida Statutes (2007). The level of required proof simply does not speak to the pertinent substantive standard.
[28] Revised statutory language appears in underlined text; deleted statutory language appears in strike-through text.
[29] In 1994, the Legislature created the DJJ and eliminated the Department of Health and Rehabilitative Services' authority to administer the delinquency system. The DJJ is now responsible for administering programs dealing with delinquent children, children in need of services, and families in need of services. See generally ch. 94-209, Laws of Fla.; see also Fla. H.R. Comm. on Juv. Just., HB 1369 (1997) Staff Analysis (final Apr. 4, 1997) (on file with Fla. State Archives, series 18, carton 2214), at 2 ["HB 1369 Staff Analysis"].
[30] "1. To settle, make, or fix firmly; to enact permanently. 2. To make or form; to bring about or into existence. 3. To prove; to convince." Black's Law Dictionary 586 (8th ed.2004) (internal illustrations omitted).
[31] "The action of ignoring or treating without proper respect or consideration." Black's Law Dictionary 506 (8th ed.2004).
[32] In addition to examining the entire statutory scheme (which is required given that the Legislature provided a mutually reinforcing, comprehensive legal framework and explicitly specified that the relevant statutes are remedial in nature), we must also construe each material portion of the statutory language present in section 985.433(7)(b). Specifically, to permissibly depart from a DJJ-recommended disposition, the statute mandates that the circuit court provide "the reasons that establish by a preponderance of the evidence why the court is disregarding the assessment of the child and the restrictiveness level recommended by the department." § 985.433(7)(b), Fla. Stat. (2007) (emphasis supplied). Thus, the relevant "reasons" must justify the act of "disregarding" not only the DJJ's recommended restrictiveness level, but also its "assessment of the child," which, as previously explained, is provided through the DJJ's comprehensive assessment and PDR. "Disregard" has both a recognized lay meaning  "to pay no attention to: treat as unworthy of regard or notice"  and a meaning drawn from the general Anglo-American legal context  "[t]he action of ignoring or treating without proper respect or consideration." Merriam Webster's Collegiate Dictionary 336 (10th ed.1996); Black's Law Dictionary 506 (8th ed.2004). Therefore, as a matter of language and logic, a circuit court cannot provide "reasons" (i.e., "a sufficient ground of explanation or of logical defense") for "disregarding" the DJJ's recommended disposition and assessment by accepting and relying upon the very information disclosed by these supposedly "disregarded" sources. Any other reading would render material portions of the legislative scheme and statute superfluous and meaningless. Cf., e.g., Koile v. State, 934 So.2d 1226, 1231 (Fla. 2006) ("[P]rovisions in a statute are not to be construed as superfluous if a reasonable construction exists that gives effect to all words and provisions."); State v. Goode, 830 So.2d 817, 824 (Fla.2002) ("[A] basic rule of statutory construction provides that the Legislature does not intend to enact useless provisions, and courts should avoid readings that would render part of a statute meaningless.").
[33] § 985.03(21), Fla. Stat. (2007); formerly § 985.03(22), Fla. Stat. (2005); formerly § 39.01(28), Fla. Stat. (1995); formerly § 39.01(21), Fla. Stat. (Supp.1990).
[34] § 985.433(7)(b), Fla. Stat. (2007); formerly § 985.23(3)(c), Fla. Stat. (2005); formerly § 39.052(4)(e)3., Fla. Stat. (1995); formerly § 39.052(3)(e)3., Fla. Stat. (Supp.1990).
[35] This section is a predecessor of section 985.03(44), Florida Statutes (2007).
[36] § 985.01(1)(e)1., Fla. Stat. (2007).